1  NICOLA T. HANNA
   United States Attorney
2  BRANDON D. FOX
   Assistant United States Attorney
3  Chief, Criminal Division
   EDDIE A. JAUREGUI (Cal. Bar No. 297986)
4  ROGER A. HSIEH (Cal. Bar No. 294195)
   Assistant United States Attorneys
5  Major Frauds Section
        1100 United States Courthouse
6        312 North Spring Street
        Los Angeles, California 90012
7        Telephone: (213) 894-4849/0600
        Facsimile: (213) 894-6269
8        E-mail:    eddie.jauregui@usdoj.gov
                   roger.hsieh@usdoj.gov
9  Attorneys for Plaintiff
   UNITED STATES OF AMERICA
10
                    UNITED STATES DISTRICT COURT
11
             FOR THE CENTRAL DISTRICT OF CALIFORNIA
12
13  UNITED STATES OF AMERICA,              No. CR 19-282-RGK
14            Plaintiff,                   [~~PROPOSED~~] ORDER ISSUING CIVIL
                                           CONTEMPT SANCTIONS TO DEFENDANTS
15                 v.                      FOR FAILURE TO APPEAR AT INITIAL
                                           APPEARANCE
16  ZHONGTIAN LIU ET AL.,
17            Defendants.
18

19       Having reviewed the government's Motion for Certification of

20  Facts and Issuance of an Order to Show Cause and the evidence

21  submitted in connection with the Motion (Dkts. 52-53), the Magistrate

22  Court's Order and Certification of Facts (Dkt. 55), the government's

23  Brief Regarding Service and exhibits thereto (Dkt. 60), the

24  government's update to the Brief Regarding Service and exhibits

25  thereto (Dkt. 61), and having presided over the Order to Show Cause

26  Hearings in this matter on September 12, 2019, and October 3, 2019,

27  the COURT HEREBY FINDS:

28

1.  Defendants 1001 Doubleday LLC, Von Karman-Main Street LLC, and 10681 Production Avenue LLC ("defendants") were properly served under Federal Rule of Criminal Procedure 4 with summonses to appear before the United States District Court to answer to an Indictment on August 26, 2019, at 2:00 p.m. at the United States Courthouse at 255 E. Temple Street, Los Angeles, California, 90012. The summonses were served on defendants via certified mail to the defendants' registered agents for service of process.

2.  None of the aforementioned defendants appeared for their initial appearances at the Roybal Federal Building, 255 East Temple Street, Los Angeles, California, in Courtroom 341, on August 26, 2019, at 2:00 p.m., notwithstanding the summonses to appear in that place and on that date and time.

3.  On September 4, 2019, the government filed a motion for certification of facts and issuance of an order to show cause. (Dkts. 52-53.)

4.  On September 9, 2019, the Magistrate Court ordered defendants to show cause in writing why they should not be adjudged in contempt by 12:00 p.m. on September 11, 2019, and appear before the District Court at 10:00 a.m. on September 12, 2019, for a show cause hearing. (Dkt. 55.)

5.  The government served the Magistrate Court's order (Dkt. 55) by mailing it to defendants' registered agent for service of process on September 9, 2019, and Federal Express records reflect that defendants were not available or the businesses were closed.

6.  Defendants did not appear at the September 12, 2019, show cause hearing. The Court then continued the show cause hearing for defendants to October 3, 2019. (Dkt. 57.)

EXHIBIT 1

7.    The government served the Magistrate Court's order (Dkt. 55) and notice of the continued October 3, 2019, show cause hearing date by mailing the documents to defendants' last known business address and the address for defendants' registered agent for service of process on September 19, 2019, via certified mail.  The Magistrate Court's order and notice of the continued October 3, 2019, show cause hearing date were delivered to defendants: (1) on September 23, 2019, at their last known business address; and (2) on October 1, 2019, to the address for their registered agent for service of process.

8.    To date, defendants have failed to state in writing why they should not be adjudged in contempt, and they failed to appear at the September 12, 2019, and October 3, 2019, show cause hearings.

9.    The government has shown by clear and convincing evidence that defendants have violated a court order by failing to appear for their initial appearances.

Accordingly, the COURT HEREBY ORDERS:

1.    Defendants shall each pay a civil contempt sanction of $2000 per calendar day, payable to the Court, until defendants schedule and appear before the Court for arraignment on the Indictment.

2.    The civil contempt sanctions against defendants shall start to accrue two calendars days after the date of entry of this Order.

3.    If defendants have not scheduled and appeared before the Court for arraignment on the Indictment four weeks after the civil contempt sanctions ordered herein have begun to accrue, the civil contempt sanctions shall increase to $4000 per calendar day for each defendant.

EXHIBIT 1

1       4.    The government may petition the Court for interim judgments

2 reflecting the accrued sanctions to be due, payable, and subject to

3 immediate collection upon entry of such interim judgments.

4       5.    The government may petition the Court to increase the daily

5 civil contempt sanction for each defendant if the fine ordered is not

6 sufficiently coercive to obtain defendants' compliance with their

7 obligations to schedule and appear for their arraignments on the

8 Indictment.

9       IT IS SO ORDERED.

October 7, 2019
_____
DATE

HONORABLE R. GARY KLAUSNER
UNITED STATES DISTRICT JUDGE

Presented by:

_____/s/_____
ROGER A. HSIEH
Assistant United States Attorney

EXHIBIT 1

| | |
|---|---|
| 1 | NICOLA T. HANNA<br>United States Attorney |
| 2 | BRANDON D. FOX<br>Assistant United States Attorney |
| 3 | Chief, Criminal Division<br>POONAM G. KUMAR (Cal. Bar No. 270802) |
| 4 | EDDIE A. JAUREGUI (Cal. Bar No. 297986)<br>ROGER A. HSIEH (Cal. Bar No. 294195) |
| 5 | Assistant United States Attorneys<br>Major Frauds Section |
| 6 | 1100 United States Courthouse<br>312 North Spring Street |
| 7 | Los Angeles, California 90012<br>Telephone: (213) 894-0719/4849/0600 |
| 8 | Facsimile: (213) 894-6269<br>E-mail: poonam.kumar@usdoj.gov |
| 9 | eddie.jauregui@usdoj.gov<br>roger.hsieh@usdoj.gov |

**NOTE CHANGES MADE BY THE COURT**

1100 United States Courthouse
312 North Spring Street
Los Angeles, California 90012
Telephone: (213) 894-0719/4849/0600
Facsimile: (213) 894-6269
E-mail:    poonam.kumar@usdoj.gov
           eddie.jauregui@usdoj.gov
           roger.hsieh@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br><br>　　　　　v.<br><br>ZHONGTIAN LIU ET AL.,<br><br>　　　　　Defendants. | No. CR 19-282-RGK<br><br>[~~PROPOSED~~] <u>ORDER INCREASING CIVIL</u><br><u>CONTEMPT SANCTIONS FOR DEFENDANTS'</u><br><u>CONTINUED FAILURE TO APPEAR AT</u><br><u>INITIAL APPEARANCE</u> |

Having reviewed the government's Motion for Certification of Facts and Issuance of an Order to Show Cause and the evidence submitted in connection with the Motion (Dkts. 52-53), the Magistrate Court's Order and Certification of Facts (Dkt. 55), the government's Brief Regarding Service and exhibits thereto (Dkt. 60), the government's update to the Brief Regarding Service and exhibits thereto (Dkt. 61), the government's Request to Increase Civil

EXHIBIT 2

Contempt Sanctions for Defendants' Continued Failure to Appear at
Initial Appearance (Dkt. 69), the files and records of this case, and
having presided over the Order to Show Cause Hearings in this matter
on September 12, 2019, and October 3, 2019, the COURT HEREBY FINDS:

1.   Defendants Perfectus Aluminium Inc., also known as
"Perfectus Aluminum Inc.," Perfectus Aluminum Acquisitions, LLC,
Scuderia Development, LLC, 1001 Doubleday LLC, Von Karman-Main Street
LLC, and 10681 Production Avenue LLC (collectively "defendants") were
properly served with the Court's orders issuing civil contempt
sanctions (Dkts. 59, 64).

2.   As of the date of this order, defendants have not scheduled
and appeared before the Court for arraignment on the Indictment.

3.   The Court incorporates its previous findings from its
orders dated September 19, 2019, (Dkt. 59) and October 7, 2019 (Dkt.
64).

Accordingly, the COURT HEREBY ORDERS that, until defendants
schedule and appear before the Court for arraignment on the
indictment, the following sanctions shall accrue:

1.   Two calendar days after the entry of this order, the civil
contempt sanctions against each defendant shall increase to $8,000
per calendar day, payable to the Court.  The previous civil contempt
sanctions of $4,000 per calendar day against each defendant (Dkts.
59, 64) will continue to accrue until the increased $8,000 per
calendar day per defendant civil contempt sanctions take effect.

2.   ~~Every four weeks after the increase to $8,000, the civil
contempt sanctions shall increase by an additional $4,000 per
calendar day per defendant,~~ _i.e.,_ ~~to $12,000 four weeks after the~~

EXHIBIT 2

1  ~~increase to $8,000, to $16,000 four weeks after the increase to~~

2  ~~$12,000, and so on~~.

3      3.    The government may petition the Court for interim judgments

4  reflecting the accrued sanctions to be due, payable, and subject to

5  immediate collection upon entry of such interim judgments.

6      4.    The government may petition the Court to further increase

7  the daily civil contempt sanction for each defendant if the fine

8  ordered is not sufficiently coercive to obtain defendants' compliance

9  with their obligations to schedule and appear for their arraignments

10  on the Indictment.

11      IT IS SO ORDERED.

12

13

14  February 9, 2020
    DATE                        HONORABLE R. GARY KLAUSNER

15                              UNITED STATES DISTRICT JUDGE

16  Presented by:

17      /s/
    ROGER A. HSIEH
    Assistant United States Attorney

18

19

20

21

22

23

24

25

26

27

28

                    EXHIBIT 2

FILED

2019 MAY -7 PM 4:21

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CA.
LOS ANGELES

BY:_____

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

January 2019 Grand Jury

| UNITED STATES OF AMERICA, | CR No. **19 CR 00282 -RGK** |
|---|---|
| Plaintiff, | **I N D I C T M E N T** |
| v. | [18 U.S.C. § 371: Conspiracy; 18 U.S.C. § 1343: Wire Fraud; 18 U.S.C. § 545: Passing False and Fraudulent Papers Through Customhouse; 18 U.S.C. § 1956(a)(2)(A): International Promotional Money Laundering; 18 U.S.C. § 2: Aiding and Abetting and Causing an Act to Be Done; 18 U.S.C. §§ 545, 981(a)(1)(C), and 982 and 28 U.S.C. § 2461(c): Criminal Forfeiture] |

ZHONGTIAN LIU,
   aka "Liu Zhongtian,"
   aka "Chairman,"
   aka "Uncle Liu,"
   aka "UL,"
   aka "Big Boss,"
CHINA ZHONGWANG HOLDINGS
   LIMITED,
   aka "ZW,"
   aka "Mother Ship,"
ZHAOHUA CHEN,
   aka "Chen Zhaohua,"
   aka "Uncle Chen,"
XIANG CHUN SHAO,
   aka "Johnson Shao,"
PERFECTUS ALUMINIUM INC.,
   aka "Perfectus Aluminum
   Inc.,"
PERFECTUS ALUMINUM ACQUISITIONS,
   LLC,
SCUDERIA DEVELOPMENT, LLC,
1001 DOUBLEDAY, LLC,
VON KARMAN – MAIN STREET, LLC, and
10681 PRODUCTION AVENUE, LLC,

      Defendants.

EXHIBIT 3

1    The Grand Jury charges:

2                              COUNT ONE

3                          [18 U.S.C. § 371]

4    A.    INTRODUCTORY ALLEGATIONS

5         At all times relevant to this Indictment, unless otherwise

6    indicated:

7         Defendants ZHONGTIAN LIU and CHINA ZHONGWANG HOLDINGS LIMITED

8         1.    Defendant ZHONGTIAN LIU, also known as ("aka") "Liu

9    Zhongtian," aka "Chairman," aka "Uncle Liu," aka "UL," aka "Big Boss"

10   ("defendant LIU"), was a lawful permanent resident of the United

11   States and a citizen of the People's Republic of China ("PRC").

12        2.    Defendant LIU controlled defendant CHINA ZHONGWANG HOLDINGS

13   LIMITED, aka "ZW," aka "Mother Ship" ("defendant CHINA ZHONGWANG").

14   Defendant LIU owned Zhongwang International Group Limited ("ZIGL"),

15   which was the parent company of defendant CHINA ZHONGWANG.  Through

16   his ownership of ZIGL, defendant LIU was the controlling shareholder

17   of defendant CHINA ZHONGWANG.  Defendant LIU was the President of

18   defendant CHINA ZHONGWANG from at least as early as in or about May

19   2009 until his resignation from that position in or about March 2016,

20   and was also the Chairman of the Board of Directors of defendant

21   CHINA ZHONGWANG from at least as early as in or about May 2009 until

22   his resignation from that position in or about November 2017.

23        3.    Defendant CHINA ZHONGWANG was an aluminum company

24   headquartered in Liaoyang City, Liaoning Province, in the PRC.

25   Defendant CHINA ZHONGWANG described itself in its 2012 Annual Report

26   as "a leading industrial aluminum extrusion product developer and

27   manufacturer in the world," and was the largest aluminum extrusion

28   manufacturer in Asia and the second largest in the world.  Aluminum

                                21              EXHIBIT 3

1  extrusions result from a process by which aluminum alloy is
2  transformed into objects such as T-bars or tubes.

3      4.    Defendant CHINA ZHONGWANG wholly owned Zhongwang China
4  Investment (HK) Limited; Liaoning Zhongwang Group Company, Limited;
5  and Liaoning Zhongwang Import & Export Trade Company Limited; among
6  other wholly-owned subsidiaries (together with defendant CHINA
7  ZHONGWANG and ZIGL, "the ZW Group").

8      5.    On or about May 8, 2009, shares of defendant CHINA
9  ZHONGWANG were listed on the Main Board of the Stock Exchange of Hong
10  Kong Limited ("SEHK") through an Initial Public Offering ("IPO").
11  The IPO was one of the world's largest in 2009 and raised capital for
12  defendant CHINA ZHONGWANG of approximately $1.26 billion.

13      6.    The SEHK required defendant CHINA ZHONGWANG to publish its
14  financial reports on a regular basis.  These reports were issued to
15  enable investors to make informed investment decisions.  Defendant
16  CHINA ZHOGNWANG published the required reports in the form of annual
17  reports, which, among other things, reported on the operations and
18  financial performance of defendant CHINA ZHONGWANG, including
19  detailed information about defendant CHINA ZHONGWANG's revenue, cost
20  of sales, gross profit, assets, and liabilities.

21      7.    In its annual reports, defendant CHINA ZHONGWANG also
22  reported its significant related party transactions.  Defendant CHINA
23  ZHONGWANG defined related parties as, among others: (a) any person,
24  or close member of that person's family, who had control or joint
25  control or significant influence over defendant CHINA ZHONGWANG, or
26  who was a member of the key management personnel of defendant CHINA
27  ZHONGWANG or ZIGL; (b) an entity controlled or jointly controlled by
28  a person identified in (a); or (c) an entity over which a person who

22                                    EXHIBIT 3

1  had control or joint control over the ZW Group had significant

2  influence or was a member of the key management personnel of the

3  entity or parent of the entity.

4      8.   In addition to annual reports, defendant CHINA ZHONGWANG

5  made disclosures to its potential and current investors regarding

6  specific issues, including in response to news reports and certain

7  allegations of wrongdoing made by third parties about defendant CHINA

8  ZHONGWANG ("specific disclosures").

9      Defendant ZHAOHUA CHEN

10      9.   Defendant ZHAOHUA CHEN, aka "Chen Zhaohua," aka "Uncle

11  Chen" ("defendant CHEN"), was a resident of the PRC and Hong Kong.

12  Defendant CHEN was a close friend of defendant LIU.

13      Defendants XIANG CHUN SHAO; PERFECTUS ALUMINIUM INC.;

14      and PERFECTUS ALUMINUM ACQUISITIONS, LLC

15      10.   Defendant XIANG CHUN SHAO, aka "Johnson Shao" ("defendant

16  SHAO"), was a resident of the Central District of California.

17      11.   Beginning at least as early as in or about 2008 and

18  continuing through at least in or about 2014, defendant SHAO, acting

19  at the direction of defendant LIU, managed the following entities

20  (collectively, the "PERFECTUS predecessor entities"), which were

21  incorporated in California between in or about January 2004 and in or

22  about August 2010: Pengcheng Aluminum Enterprise, Inc. ("PCA");

23  Century American Aluminum, Inc. ("CAA"); Global Aluminum (USA), Inc.

24  ("Global Aluminum"); American Apex Aluminum, Inc. ("AAA"); Aluminum

25  Source, Inc. ("Aluminum Source"); Transport Aluminum, Inc.

26  ("Transport Aluminum"); and Aluminum Industrial, Inc. ("Aluminum

27  Industrial").

28      12.   The principal office of each of the PERFECTUS predecessor

23           EXHIBIT 3

1  entities was located in Walnut or Ontario, California, within the
2  Central District of California.

3      13.  On or about July 28, 2006, a bank account ending in 9191 in
4  the name of PCA was opened at Cathay Bank in the City of Industry,
5  California, within the Central District of California ("PCA Account
6  9191").

7      14.  On or about August 26, 2011, a bank account ending in 2058
8  in the name of Transport Aluminum was opened at Cathay Bank in the
9  City of Industry, California, within the Central District of
10  California ("Transport Account 2058").

11     15.  On or about December 4, 2014, defendant PERFECTUS ALUMINIUM
12  INC., aka "Perfectus Aluminum Inc." ("defendant PERFECTUS") was
13  incorporated in California by unindicted co-conspirator 1 ("CC-1").
14  CC-1 was a close family member of defendant LIU.  Defendant
15  PERFECTUS's principal office was located in Ontario, California,
16  within the Central District ·of California.  In or about 2016,
17  defendant SHAO was appointed as a manager of defendant PERFECTUS.

18     16.  On or about December 10, 2014, defendant PERFECTUS ALUMINUM
19  ACQUISITIONS, LLC ("defendant PERFECTUS ACQUISITIONS") was formed in
20  Delaware.  Defendant PERFECTUS ACQUISITIONS was a wholly-owned
21  subsidiary of defendant PERFECTUS.  On or about December 31, 2014,
22  the PERFECTUS predecessor entities were merged into defendant
23  PERFECTUS ACQUISITIONS. ·At the time of the merger, all assets,
24  obligations, and liabilities of the PERFECTUS predecessor entities
25  were transferred to and assumed by defendant PERFECTUS ACQUISITIONS.

26     17.  At the time of the merger of the PERFECTUS predecessor
27  entities and defendant PERFECTUS ACQUISITIONS, CC-1 was the sole
28  officer of each of the PERFECTUS predecessor entities and defendant

24     EXHIBIT 3

1 PERFECTUS, as well as the manager of defendant PERFECTUS

2 ACQUISITIONS.

3  18.  Following the merger: (a) defendant PERFECTUS continued the

4 business operations of the PERFECTUS predecessor entities and in some

5 instances, operated under the name of one or more of the PERFECTUS

6 predecessor entities; (b) defendants PERFECTUS and PERFECTUS

7 ACQUISITIONS were separated only by corporate form and acted as one

8 entity; (c) defendant PERFECTUS ACQUISITIONS was a disregarded entity

9 for tax purposes; (d) defendant PERFECTUS included all of the

10 PERFECTUS predecessor entities' assets and liabilities on defendant

11 PERFECTUS's financial statements and tax returns; and (e) regardless

12 of the corporate form and names of the entities, the PERFECTUS

13 predecessor entities and defendants PERFECTUS and PERFECTUS

14 ACQUISITIONS were all effectively owned and controlled by defendant

15 LIU and were all operated pursuant to his directions.

16  Defendants SCUDERIA DEVELOPMENT, LLC; 1001 DOUBLEDAY, LLC;

17  VON KARMAN – MAIN STREET, LLC; and 10681 PRODUCTION AVENUE, LLC

18  19.  On or about October 22, 2007, defendant SCUDERIA

19 DEVELOPMENT, LLC ("defendant SCUDERIA DEVELOPMENT") was formed in

20 Delaware.  On or about October 28, 2014, defendant SCUDERIA

21 DEVELOPMENT purchased a 600,000 square foot warehouse located at

22 14600 Innovation Drive, Riverside, California, within the Central

23 District of California (the "Riverside Warehouse").  Defendant LIU

24 effectively owned and controlled defendant SCUDERIA DEVELOPMENT and

25 the Riverside Warehouse.

26  20.  On or about October 27, 2008, defendant 1001 DOUBLEDAY, LLC

27 ("defendant 1001 DOUBLEDAY") purchased a 394,000 square foot

28 warehouse located at 1001 South Doubleday Avenue, Ontario,

25

EXHIBIT 3

1  California, within the Central District of California (the "Ontario

2  Warehouse").  Defendant LIU effectively owned and controlled

3  defendant 1001 DOUBLEDAY and the Ontario Warehouse.

4      21.  On or about March 31, 2009, defendant VON KARMAN – MAIN

5  STREET, LLC ("defendant VON KARMAN – MAIN STREET") purchased a

6  260,000 square foot warehouse located at 2323 Main Street, Irvine,

7  California, within the Central District of California (the "Irvine

8  Warehouse").  Defendant LIU effectively owned and controlled

9  defendant VON KARMAN – MAIN STREET and the Irvine Warehouse.

10     22.  On or about September 11, 2009, defendant 10681 PRODUCTION

11  AVENUE, LLC ("defendant 10681 PRODUCTION AVENUE") purchased a 1.1

12  million square foot warehouse located at 10681 Production Avenue,

13  Fontana, California, within the Central District of California (the

14  "Fontana Warehouse").  Defendant LIU effectively owned and controlled

15  defendant 10681 PRODUCTION AVENUE and the Fontana Warehouse.

16     Other Aluminum Companies Controlled by Defendant LIU

17     23.  From at least as early as in or about November 2010, and

18  continuing at least to the date of this Indictment, Aluminicaste

19  Fundición de México ("Aluminicaste") was an aluminum company

20  headquartered in Mexico.  Aluminicaste was effectively owned and

21  controlled by defendant LIU.

22     24.  On or about December 1, 2012, Global Aluminum purchased an

23  entity later known as Aluminum Shapes LLC, aka "Shapes LLC," aka

24  "Delair Aluminum, LLC" ("Aluminum Shapes"), an aluminum company

25  located in Delair, New Jersey.  Following the merger of Global

26  Aluminum and the remaining PERFECTUS predecessor entities into

27  defendant PERFECTUS ACQUISITIONS, Aluminum Shapes was wholly owned

28  by, and became an asset of, defendants PERFECTUS and PERFECTUS

1  ACQUISITIONS. Defendant LIU effectively owned and controlled
2  Aluminum Shapes.

3      25. From at least as early as in or about 2013, Global Vietnam
4  Aluminum ("GVA") was an aluminum company headquartered in Vietnam.
5  GVA was effectively owned and controlled by defendant LIU.

6          The 2011 Anti-Dumping and Countervailing Duties Orders
7            Regarding Aluminum Imported By ZW Group

8      26. The United States Department of Commerce ("DOC") and the
9  United States International Trade Commission ("USITC") regulated
10  commerce in the United States, and, as part of their
11  responsibilities, had the authority to impose duties on certain
12  foreign imports. Among other duties, the DOC and USITC imposed anti-
13  dumping and countervailing duties ("AD/CVD"). AD/CVD orders were
14  formal determinations issued by the DOC and USITC that AD/CVD duties
15  should be collected by U.S. Customs and Border Protection ("CBP") on
16  imports of a particular product from specified countries and
17  companies. AD/CVD orders were intended to ensure fair competition
18  between United States companies and foreign industry, and to counter
19  international price discrimination that caused injury to United
20  States domestic industries.

21      27. In or about April 2010, the USITC and DOC initiated an
22  investigation of whether AD/CVD duties should be imposed on imports
23  of certain aluminum extrusions from the PRC.

24      28. On or about May 26, 2011, the DOC issued an AD order and a
25  CVD order ("2011 AD/CVD Orders") that imposed enhanced CVD duties of
26  374.15% on certain aluminum extrusions imported from the ZW Group and
27  AD duties of 33.28% on certain aluminum extrusions imported from the
28  PRC. The 2011 AD/CVD Orders exempted from AD/CVD duties any finished

27                                              EXHIBIT 3

1   merchandise, which was defined by DOC as products that were fully and
2   permanently assembled and completed at the time of entry, such as
3   finished windows with glass, doors with glass or vinyl, picture
4   frames with glass pane and backing material, and solar panels.

5      29. CBP was responsible for, among other things, the
6   examination of merchandise entering the United States through ports
7   and other points of entry to ensure that the merchandise was
8   admissible under, and in compliance with United States laws; and the
9   assessment and collection of all applicable taxes, fees, and duties,
10   including AD/CVD duties, on imported merchandise.

11      30. CBP Form 7501 ("Form 7501" or "Entry Summary") required
12   importers, or their agents, to provide truthful information relating
13   to imported merchandise, including: a description of the merchandise;
14   the identity of the merchandise's manufacturer, its value, and
15   country of origin; the entry type; and the AD/CVD rate, if any. A
16   customhouse broker or agent normally handled the process of entering
17   goods into the United States on behalf of an importer, which process
18   included completing entry documents, including Form 7501, based on
19   information provided by the importer, and filing the completed Form
20   7501 with CBP on behalf of the importer. Entry type "01" was the
21   entry type to be used when the goods at issue in the Form 7501 were
22   free and dutiable. Entry type "03" was the entry type to be used
23   when the goods at issue in the Form 7501 were subject to applicable
24   AD/CVD orders.

25      31. The Port of Los Angeles and the Port of Long Beach
26   (collectively referred to by CBP as the "Los Angeles/Long Beach
27   Seaport") were ports located within the Central District of
28   California.

28

EXHIBIT 3

B.    THE OBJECTS OF THE CONSPIRACY

    32.    Beginning in or about July 2008 and continuing to at least the date of this Indictment, in Los Angeles, Orange, Riverside, and San Bernardino Counties, within the Central District of California, and elsewhere, defendants LIU, CHINA ZHONGWANG, CHEN, SHAO, PERFECTUS, PERFECTUS ACQUISITIONS, SCUDERIA DEVELOPMENT, 1001 DOUBLEDAY, VON KARMAN - MAIN STREET, and 10681 PRODUCTION AVENUE, and others known and unknown to the Grand Jury, knowingly combined, conspired and agreed with each other to: (I) knowingly and intentionally defraud the United States and an agency thereof by impeding, impairing, obstructing, and defeating the lawful functions of a government agency, namely, CBP, by deceitful and dishonest means; and (II) commit offenses against the United States, namely:

    a.    Wire Fraud, in violation of Title 18, United States Code, Section 1343;

    b.    Passing False and Fraudulent Papers Through Customhouse, in violation of Title 18, United States Code, Section 545; and

    c.    International Promotional Money Laundering, in violation of Title 18, United States Code, Section 1956(a)(2)(A).

C.    MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE
      ACCOMPLISHED

    33.    The objects of the conspiracy were carried out, and were to be carried out, in substance as follows:

    a.    Defendants LIU, CHINA ZHONGWANG, CHEN, SHAO, PERFECTUS, PERFECTUS ACQUISITIONS, SCUDERIA DEVELOPMENT, 1001 DOUBLEDAY, VON KARMAN - MAIN STREET, and 10681 PRODUCTION AVENUE, would agree to, and would, engage in deceptive acts in order to:

EXHIBIT 3

1           i.    Fraudulently induce investors in defendant CHINA

2  ZHONGWANG to purchase and hold shares of defendant CHINA ZHONGWANG

3  by:

4           (I)    falsely inflating the value of defendant

5  CHINA ZHONGWANG at the time of the IPO through false representations,

6  including that an independent third party had made a $200 million

7  loan to ZIGL in advance of the IPO;

8           (II) falsely inflating the sales revenue of

9  defendant CHINA ZHONGWANG through false representations and

10  pretenses, including the false representation that the vast majority

11  of defendant CHINA ZHONGWANG's sales were made at arm's length, and

12  the concealment of material facts, including that defendant CHINA

13  ZHONGWANG's sales to the PERFECTUS predecessor entities, defendant

14  PERFECTUS, and certain aluminum shell companies in the PRC were not

15  arms-length transactions and were funded by money ultimately provided

16  by defendants LIU, CHINA ZHONGWANG, and CHEN;

17           (III)    falsely inflating the volume of

18  defendant CHINA ZHONGWANG's exports to the United States and the

19  strength of the demand in the United States for its products through

20  false representations and pretenses, including the false

21  representation and pretense that market demand for certain aluminum

22  products manufactured by defendant CHINA ZHONGWANG was the reason for

23  defendant CHINA ZHONGWANG's increased exports to the United States

24  after the 2011 AD/CVD Orders, and the concealment of material facts,

25  including that the PERFECTUS predecessor entities and defendant

26  PERFECTUS's purchases from defendant CHINA ZHONGWANG were not based

27  on market demand from third-party customers and the purchased

28  aluminum was simply being stockpiled; and

1          (IV) falsely inflating the overall financial

2   position of defendant CHINA ZHONGWANG through the concealment of

3   material facts, including that defendant CHINA ZHONGWANG's revenues

4   included purchases that defendants LIU, CHINA ZHONGWANG, and CHEN had

5   funded, and that its related parties had liabilities arising from the

6   related parties' purported purchases from defendant CHINA ZHONGWANG,

7   namely, approximately $1.8 billion in AD/CVD duties due to CBP.

8          ii.  Fraudulently conceal from the CBP and the United

9   States Treasury that aluminum that the PERFECTUS predecessor entities

10  and defendants LIU, CHINA ZHONGWANG, and SHAO were importing and

11  causing to be imported into the United States was subject to duties

12  imposed by the 2011 AD/CVD Orders, thereby evading approximately $1.8

13  billion in duties owed to the United States; and

14         iii. Engage in monetary transactions that allowed

15  defendant CHINA ZHONGWANG to secretly fund the purchases of aluminum

16  imported into the United States from defendant CHINA ZHONGWANG,

17  thereby enabling: (a) defendants to maintain the false pretense that

18  defendant CHINA ZHONGWANG was obtaining significant revenue from

19  sales of aluminum to United States-based customers even though there

20  were few, if any, such sales; (b) defendants to continue to evade

21  applicable AD/CVD duties; and (c) defendant LIU to transfer valuable

22  assets, namely bulk quantities of aluminum, from defendant CHINA

23  ZHONGWANG in the PRC to entities in the United States that defendant

24  LIU controlled.

25         The Fraudulent Inflation of Defendant CHINA ZHONGWANG's

26         Financial Statements

27         b.   Defendants LIU and CHINA ZHONGWANG would cause

28  defendant CHINA ZHONGWANG's shares to be listed on the Main Board of

31                          EXHIBIT 3

1 the SEHK.  In order to induce investors to purchase and hold shares
2 of defendant CHINA ZHONGWANG, both at the time of the IPO and
3 thereafter, defendants LIU and CHINA ZHONGWANG would cause defendant
4 CHINA ZHONGWANG to issue an IPO prospectus, annual reports, and
5 specific disclosures that would contain materially false statements
6 regarding, among other things, defendant CHINA ZHONGWANG's sales,
7 revenue, U.S. export program, and related party transactions.

8      c.  In order to complete the IPO and falsely inflate the
9 value of defendant CHINA ZHONGWANG, defendant LIU would direct an
10 unindicted co-conspirator ("CC-2") to transfer approximately $200
11 million to ZIGL as a purported loan when, in fact, ZIGL did not
12 intend to repay the loan and the transfer of the funds was identified
13 as a loan in order to conceal that the funds for the purported loan
14 had originated from accounts controlled by defendants LIU, CHINA
15 ZHONGWANG, and CHEN.  Defendants LIU and CHINA ZHONGWANG would cause
16 the IPO prospectus to falsely state that the purported loan
17 originated from an independent third party.

18      d.  Defendants LIU, CHINA ZHONGWANG, and SHAO, and other
19 co-conspirators, would use the PERFECTUS predecessor entities and
20 defendant PERFECTUS to purchase aluminum from defendant CHINA
21 ZHONGWANG, the ZW Group, and the aluminum shell companies, as defined
22 below in paragraph 33(g), that had been manufactured by defendant
23 CHINA ZHONGWANG and the ZW Group.

24      e.  Defendants LIU and CHINA ZHONGWANG would conceal their
25 connection to the PERFECTUS predecessor entities and defendants
26 PERFECTUS and PERFECTUS ACQUISITIONS by, among other means,
27 purporting to transfer ownership and control of the PERFECTUS
28 predecessor entities and defendant PERFECTUS to defendant SHAO, CC-1,

     EXHIBIT 3

1  and/or other purported third parties when, in fact, defendant LIU

2  effectively owned and controlled the PERFECTUS predecessor entities

3  and defendants PERFECTUS and PERFECTUS ACQUISITIONS.

4        f.   In order to conceal defendants LIU and CHINA

5  ZHONGWANG's connection to the PERFECTUS predecessor entities and

6  defendants PERFECTUS and PERFECTUS ACQUISITIONS, defendants LIU,

7  CHINA ZHONGWANG, SHAO, and PERFECTUS, the PERFECTUS predecessor

8  entities, and other co-conspirators, would falsely represent the

9  nature of the relationships among the PERFECTUS predecessor entities

10  and defendants CHINA ZHONGWANG and PERFECTUS in communications with,

11  and in documents submitted to, among others, the USITC, the few

12  third-party customers who purchased aluminum extrusions from the

13  PERFECTUS predecessor entities and defendant PERFECTUS, and the

14  Internal Revenue Service ("IRS").

15        g.   In order to conceal that defendant CHINA ZHONGWANG

16  and/or the ZW Group was the source of the aluminum being sold to the

17  PERFECTUS predecessor entities, defendants LIU, CHINA ZHONGWANG, and

18  CHEN, and other co-conspirators, would identify shell companies (the

19  "aluminum shell companies") as the nominal sellers of this aluminum.

20  The names of the shell companies would conceal and not disclose the

21  connection between defendants LIU and CHINA ZHONGWANG and the

22  aluminum shell companies.  The aluminum shell companies were

23  controlled by defendants LIU, CHINA ZHONGWANG, and CHEN.  The

24  aluminum shell companies included, but were not limited to: Dalian

25  Liwang Trade Co., Ltd. ("Dalian Liwang"); Tianjin Boruixin Co., Ltd.

26  ("Boruixin"); Yingkou Qianxiang Trade Co. Ltd. ("Qianxiang"); and

27  Gran Cabrio Capital Pte. Ltd. ("Gran Cabrio").

28        h.   Following the issuance of the 2011 AD/CVD Orders,

1  defendants LIU and CHINA ZHONGWANG would cause the aluminum
2  extrusions being imported by the PERFECTUS predecessor entities to be
3  shipped to the United States in the form of pallets (the "aluminum
4  pallets"). Because there were no customers for these aluminum
5  pallets, defendants LIU and CHINA ZHONGWANG would sometimes cause
6  emails to be sent to defendant SHAO to enable him to create fake
7  purchase orders for the aluminum pallets. The emails would state the
8  form and quantity of the aluminum pallets that defendants LIU and
9  CHINA ZHONGWANG already intended to, and would, export to the United
10 States to be imported by the PERFECTUS predecessor entities for the
11 purported sale to the PERFECTUS predecessor entities' supposed
12 customers. In other instances, defendants SHAO and the PERFECTUS
13 predecessor entities would create purchase orders after being told by
14 defendant CHINA ZHONGWANG that a shipment of aluminum extrusions in
15 the form of pallets was already en route to the Ports of Los Angeles
16 and Long Beach. Although prior to the 2011 AD/CVD Orders, defendants
17 LIU and CHINA ZHONGWANG had not exported, and defendant SHAO and the
18 PERFECTUS predecessor entities had not imported, any aluminum
19 extrusions in the form of pallets, defendants LIU, CHINA ZHONGWANG,
20 CHEN, and SHAO would cause the PERFECTUS predecessor entities to
21 import into the United States approximately 2,200,000 such pallets
22 between in or about 2011 and in or about 2014. At the direction of
23 defendant LIU, none of these pallets was ever sold.

24          i.   At the direction of defendant LIU, defendants SCUDERIA
25 DEVELOPMENT, 1001 DOUBLEDAY, VON KARMAN – MAIN STREET, and 10681
26 PRODUCTION AVENUE would purchase the Riverside, Ontario, Irvine, and
27 Fontana Warehouses, respectively.

28          j.   At the direction of defendant LIU, defendants SHAO,

34          EXHIBIT 3

1   PERFECTUS, SCUDERIA DEVELOPMENT, 1001 DOUBLEDAY, VON KARMAN – MAIN
2   STREET, and 10681 PRODUCTION AVENUE, and the PERFECTUS predecessor
3   entities, would stockpile and cause to be stockpiled the aluminum
4   extrusions in the form of pallets purchased from the ZW Group and the
5   aluminum shell entities at the Irvine, Ontario, Fontana, and
6   Riverside Warehouses, and at Aluminum Shapes in New Jersey. By
7   stockpiling and causing to be stockpiled the aluminum extrusions in
8   the form of pallets, defendants LIU, SHAO, PERFECTUS, SCUDERIA
9   DEVELOPMENT, 1001 DOUBLEDAY, VON KARMAN – MAIN STREET, and 10681
10  PRODUCTION AVENUE maintained the pretense that the sales of the
11  aluminum pallets to the PERFECTUS predecessor entities were actual
12  sales to customers in the United States.

13          k.   In order to maintain the pretense that the PERFECTUS
14  predecessor entities and defendant PERFECTUS were purchasing the
15  aluminum from defendant CHINA ZHONGWANG and/or the ZW Group and
16  thereby generating revenue for defendant CHINA ZHONGWANG, defendants
17  LIU and CHINA ZHONGWANG would cause invoices for the aluminum to be
18  sent to defendants SHAO and PERFECTUS, and the PERFECTUS predecessor
19  entities. Defendant CHINA ZHONGWANG would also direct employees of
20  the ZW Group to email defendant SHAO and others seeking payment on
21  outstanding invoices.

22          l.   The value of the aluminum purportedly purchased by the
23  PERFECTUS predecessor entities from the ZW Group and the aluminum
24  shell companies greatly exceeded the revenue the PERFECTUS
25  predecessor entities obtained from actual sales. As a result, the
26  PERFECTUS predecessor entities did not have sufficient funds to pay
27  for the aluminum they were importing. Accordingly, defendants SHAO
28  and PERFECTUS, and the PERFECTUS predecessor entities, would request

35                          EXHIBIT 3

1 funding from defendant CHINA ZHONGWANG to pay the invoices from
2 defendant CHINA ZHONGWANG and/or ZW Group.

3       m.   After receiving funding requests from defendants SHAO
4 and PERFECTUS, defendants LIU, CHINA ZHONGWANG, and CHEN, and other
5 co-conspirators, would transfer and cause the transfer by wire of
6 funds worth hundreds of millions of dollars to bank accounts
7 controlled by defendants SHAO, PERFECTUS, and PERFECTUS ACQUISITIONS,
8 and the PERFECTUS predecessor entities. The funds would originate in
9 bank accounts controlled by defendants LIU, CHINA ZHONGWANG, and
10 CHEN, but held in the names of shell companies in order to conceal
11 the origin, ownership, and control of the funds (collectively, the
12 "financial shell companies"). These financial shell companies
13 included, but were not limited to, Anhe Trading Co.; Best Success
14 Holdings Limited; Bright Rich Investments Limited; DNH Trading Co.
15 Limited; Easy Able International (HK); Fast Growth Co.; Grand Famous
16 Trading Limited; Guanghui Great Exploit (HK) Limited; Guocang Trade
17 Limited; HK De Ming Trade Co. Limited; Kingson Co.; Kingnuo
18 Communication Electronics Co., Ltd.; Kong Yum Trading Co.; Kun Hong
19 Trade Co., Ltd.; Money Top Trading, Ltd.; Porter (International)
20 Supplies; Rainbow Bright Inc. Limited; Rui Yin Co.; and SNS Great
21 Cause Investment Ltd.

22       n.   Defendant SHAO would cause the receipt of funds from
23 the financial shell companies to be recorded as loans on the books
24 and in the records of the PERFECTUS predecessor entities and
25 defendant PERFECTUS when, in truth and in fact, the funds were not
26 loans and the PERFECTUS predecessor entities and defendant PERFECTUS
27 never intended to repay the funds. As of on or about December 31,
28 2014, the PERFECTUS predecessor entities had recorded on their

36

EXHIBIT 3

1 | balance sheets a cumulative total of at least approximately $1.2
2 | billion in purported loans, the vast majority of which originated
3 | from the financial shell companies.

4 |       o.    After receiving funds from the financial shell
5 | companies, defendants SHAO and PERFECTUS, and the PERFECTUS
6 | predecessor entities, would cause funds to be transferred by wire
7 | from bank accounts in the name of defendant PERFECTUS and the
8 | PERFECTUS predecessor entities, located within the Central District
9 | of California, to bank accounts in the name of entities within the ZW
10 | Group, located in Hong Kong and the PRC, and the bank accounts of the
11 | aluminum shell companies, located in Hong Kong and the PRC.

12 |       p.    Defendant LIU would cause defendant CHINA ZHONGWANG to
13 | falsely record the sales to defendant PERFECTUS and the PERFECTUS
14 | predecessor entities made directly by the ZW Group and through the
15 | aluminum shell companies on defendant CHINA ZHONGWANG's financial
16 | statements as arms-length transactions.  Defendant CHINA ZHONGWANG
17 | would further falsely record the funds received from defendant
18 | PERFECTUS, the PERFECTUS predecessor entities, and the aluminum shell
19 | companies as revenue, thereby fraudulently increasing the overall
20 | revenue recorded by defendant CHINA ZHONGWANG and making it appear as
21 | though defendant CHINA ZHONGWANG's financial position and export
22 | program were stronger than they, in fact, were.

23 |       q.    Defendant LIU would cause defendant CHINA ZHONGWANG to
24 | issue annual reports containing materially false statements and
25 | omissions.  These false statements and omissions would be material to
26 | investors in defendant CHINA ZHONGWANG.

27 |       r.    At the direction of defendant LIU, defendant CHINA
28 | ZHONGWANG's annual reports would falsely state, among other things,

EXHIBIT 3

1  that:

2          i.    all of the purported sales to the PERFECTUS

3  predecessor entities and defendant PERFECTUS and aluminum shell

4  companies were arms-length sales to customers;

5          ii.   there was high demand for deep-processed aluminum

6  products, namely, aluminum pallets, that resulted in increasing sales

7  and exports to the United States; and

8          iii. all funds received from defendants SHAO and

9  PERFECTUS, and the PERFECTUS predecessor entities, and the aluminum

10  shell companies, were revenue.

11         s.    Further, at the direction of defendant LIU, defendant

12  CHINA ZHONGWANG would fail to disclose, among other things, that:

13         i.    defendant LIU effectively owned and controlled

14  the PERFECTUS predecessor entities and defendants PERFECTUS and

15  PERFECTUS ACQUISITIONS;

16         ii.   defendants LIU and CHINA ZHONGWANG controlled the

17  aluminum shell companies;

18         iii. defendants LIU and CHINA ZHONGWANG had directed

19  the PERFECTUS predecessor entities to purchase aluminum manufactured

20  and sold by defendant CHINA ZHONGWANG and the ZW Group;

21         iv.   defendants LIU and CHINA ZHONGWANG had directed

22  that, after the 2011 AD/CVD Orders, the aluminum be imported as

23  aluminum extrusions in the form of pallets, for which there was no

24  customer demand;

25         v.    purported sales to the PERFECTUS predecessor

26  entities and aluminum shell companies were related party

27  transactions; and

28         vi.   defendants LIU and CHINA ZHONGWANG had provided

                        38                    EXHIBIT 3

1  the funds for the purchase of the aluminum.

2        t.  After allegations of fraud were publicly made against

3  defendants LIU and CHINA ZHONGWANG, defendants LIU and CHINA

4  ZHONGWANG would cause false specific disclosures to be issued to

5  investors and potential investors.  In particular, defendant CHINA

6  ZHONGWANG would issue specific disclosures falsely stating that:

7  defendant LIU did not control defendant PERFECTUS and the PERFECTUS

8  predecessor entities, Dalian Liwang, Boruixin, Qianxiang, GVA, and

9  Aluminicaste; all sales not reported as related party transactions

10 were arms-length transactions; and defendant CHINA ZHONGWANG had not

11 provided the funding for the aluminum purchased by any of its

12 customers.  These false statements were material to investors in

13 defendant CHINA ZHONGWANG.

14       u.  After allegations of fraud were publicly made against

15 defendants LIU and CHINA ZHONGWANG, and in order to impede any

16 investigations into the allegations, defendants LIU, SHAO, PERFECTUS,

17 SCUDERIA DEVELOPMENT, 1001 DOUBLEDAY, VON KARMAN – MAIN STREET, and

18 10681 PRODUCTION AVENUE would cause the aluminum stored at the

19 Irvine, Ontario, Fontana, and Riverside Warehouses to be exported to

20 GVA.

21       v.  After allegations of fraud were publicly made against

22 defendants LIU and CHINA ZHONGWANG and in order to lull investors

23 into believing defendant CHINA ZHONGWANG's prior disclosures,

24 defendant LIU would cause unindicted co-conspirators to falsely claim

25 ownership of defendant PERFECTUS, the aluminum imported by the

26 PERFECTUS predecessor entities, and the Ontario, Irvine, Fontana, and

27 Riverside Warehouses.

28       w.  By causing defendant CHINA ZHONGWANG to make the

EXHIBIT 3

1 above-described material false statements regarding defendant CHINA
2 ZHONGWANG's assets, revenue, and overall financial position to
3 investors, defendant LIU fraudulently inflated the value of his own
4 shares in defendant CHINA ZHONGWANG as well as his creditworthiness
5 and the creditworthiness of defendant CHINA ZHONGWANG.  Through the
6 above-described material false statements and concealment of material
7 facts, defendants LIU and CHINA ZHONGWANG also exposed the remaining
8 shareholders of defendant CHINA ZHONGWANG to the risk that defendant
9 CHINA ZHONGWANG would plummet in value when defendant CHINA
10 ZHONGWANG's fraudulent business practices were discovered.

11          The Evasion of Duties under the 2011 AD/CVD Orders

12          x.   Prior to the AD/CVD investigation and 2011 AD/CVD
13 Orders, defendants LIU and CHINA ZHONGWANG would direct defendant
14 SHAO and the PERFECTUS predecessor entities to purchase aluminum
15 extrusions from the ZW Group and aluminum shell companies and import
16 them into the United States through the Ports of Los Angeles and Long
17 Beach.  Although the PERFECTUS predecessor entities sold some of the
18 aluminum extrusions imported from the ZW Group and aluminum shell
19 companies to third-party customers, the PERFECTUS predecessor
20 entities would stockpile the vast majority of the aluminum extrusions
21 at the Irvine, Ontario, and Fontana Warehouses.

22          y.   The 2011 AD/CVD Orders imposed substantial costs on
23 the importation of certain aluminum extrusions into the United States
24 from certain Chinese companies, including the ZW Group.  To
25 circumvent the AD/CVD duties, defendants LIU, CHINA ZHONGWANG, and
26 CHEN, and other co-conspirators, would export, and defendants SHAO
27 and PERFECTUS and the PERFECTUS predecessor entities would import,
28 aluminum extrusions in the form of pallets, that is, the extrusions

40                         EXHIBIT 3

1  would be tack-welded into the shape of pallets, which would then
2  enter the United States through the Ports of Los Angeles and Long
3  Beach, as well as the Port of New York and New Jersey, as purported
4  finished merchandise not subject to duties under the 2011 AD/CVD
5  Orders.

6          z.   In order to ensure that the plan to circumvent the
7  AD/CVD duties would work, defendants LIU and CHEN would cause several
8  test shipments containing aluminum extrusions in the form of pallets
9  to be imported by entities other than the PERFECTUS predecessor
10  entities, including Berlinetta Trading, LLC ("Berlinetta Trading").

11          aa.   Defendants LIU, CHINA ZHONGWANG, CHEN, and SHAO, and
12  other co-conspirators, would cause the PERFECTUS predecessor entities
13  to falsely identify on Form 7501 the aluminum extrusions in the form
14  of pallets as finished merchandise that would not be subject to the
15  2011 AD/CVD Orders, when, in truth and in fact, and as defendants
16  LIU, CHINA ZHONGWANG, CHEN, and SHAO then well knew, the aluminum
17  extrusions in the form of pallets were not finished merchandise.   By
18  falsely identifying the pallets as finished merchandise, the
19  PERFECTUS predecessor entities were able to evade paying
20  approximately $1.8 billion in AD/CVD duties.

21          bb.   By stockpiling and causing to be stockpiled the
22  aluminum fraudulently imported as finished merchandise not subject to
23  duties under the 2011 AD/CVD Orders, defendants LIU, SHAO, PERFECTUS,
24  SCUDERIA DEVELOPMENT, 1001 DOUBLEDAY, VON KARMAN – MAIN STREET, and
25  10681 PRODUCTION AVENUE maintained the pretense that the aluminum
26  extrusions in the form of pallets were finished merchandise that had
27  been sold to customers in the United States and prevented the CBP
28  from discovering that it was extrusions subject to AD/CVD duties.

41

EXHIBIT 3

1           cc.  Knowing that the aluminum imported as pallets was, in

2    fact, nothing more than extrusions that had been tack-welded together

3    to enable defendants LIU, CHINA ZHONGWANG, CHEN, and SHAO, and other

4    co-conspirators, to falsely claim it was finished merchandise not

5    subject to the 2011 AD/CVD Orders, and that there were no customers

6    for the aluminum extrusions in the form of pallets, the vast majority

7    of which were too heavy to be usable as pallets, defendants LIU and

8    CHINA ZHONGWANG would direct that aluminum melting facilities be

9    built and acquired to be used to reconfigure the aluminum imported as

10   pallets into a form with commercial value.

11   D.   OVERT ACTS

12       34.  On or about the following dates, in furtherance of the

13   conspiracy and to accomplish its objects, defendants LIU, CHINA

14   ZHONGWANG, CHEN, SHAO, PERFECTUS, PERFECTUS ACQUISITIONS, SCUDERIA

15   DEVELOPMENT, 1001 DOUBLEDAY, VON KARMAN – MAIN STREET, and 10681

16   PRODUCTION AVENUE, together with others known and unknown to the

17   Grand Jury, committed and willfully caused others to commit the

18   following overt acts, among others, in Los Angeles, Orange,

19   Riverside, and San Bernardino Counties, within the Central District

20   of California and elsewhere:

21       Overt Act No. 1:   In or about July 2008, defendant LIU caused

22   approximately $195,633,053 to be transferred through intermediary

23   entities to a bank account held at United Commercial Bank in the name

24   of Scuderia Capital Partners, LLC ("the Scuderia Capital Partners

25   Account").

26       Overt Act No. 2:   On or about July 28, 2008, CC-1 resigned as

27   a manager of Scuderia Capital Partners, LLC ("Scuderia Capital").

28       Overt Act No. 3:   On or about July 28, 2008, defendant LIU

1  directed CC-2 to transfer approximately $100,000,000 to ZIGL from the

2  Scuderia Capital Partners Account.

3       Overt Act No. 4:    In or about August 2008, defendant LIU

4  caused approximately $4,999,960 to be transferred through

5  intermediary entities to the Scuderia Capital Partners Account.

6       Overt Act No. 5:    On or about August 5, 2008, defendant LIU

7  directed CC-2 to transfer approximately $90,000,000 to ZIGL from the

8  Scuderia Capital Partners Account.

9       Overt Act No. 6:    On or about August 7, 2008, defendant LIU

10 directed CC-2 to transfer approximately $10,000,000 to ZIGL from the

11 Scuderia Capital Partners Account.

12      Overt Act No. 7:    On or about October 27, 2008, defendant LIU

13 caused defendant 1001 DOUBLEDAY to purchase the Ontario Warehouse for

14 the purpose of stockpiling aluminum.

15      Overt Act No. 8:    On or about December 3, 2008, defendants LIU

16 and SHAO caused to be filed with the California Secretary of State a

17 PCA Statement of Information identifying defendant SHAO as the CEO,

18 Secretary, CFO, and sole director of PCA.

19      Overt Act No. 9:    On or about March 31, 2009, defendant LIU

20 caused defendant VON KARMAN - MAIN STREET to purchase the Irvine

21 Warehouse for the purpose of stockpiling aluminum.

22      Overt Act No. 10:   On or about April 24, 2009, defendants LIU

23 and CHINA ZHONGWANG caused an IPO prospectus to be issued.  The IPO

24 prospectus falsely stated that ZIGL had obtained a $200 million loan

25 from Scuderia Capital for the purposes of completing the IPO.  The

26 prospectus falsely stated that the shareholder and director of

27 Scuderia Capital were not "connected persons" to defendant CHINA

28 ZHONGWANG.  The prospectus failed to disclose that defendant LIU

EXHIBIT 3

1  controlled Scuderia Capital and that defendant LIU, through
2  intermediaries, had provided Scuderia Capital the funds for its
3  purported $200 million loan to ZIGL.

4  　　　Overt Act No. 11:　On or about May 8, 2009, defendant LIU
5  caused defendant CHINA ZHONGWANG to be listed on the Main Board of
6  the SEHK.

7  　　　Overt Act No. 12:　On or about September 11, 2009, defendant
8  LIU caused defendant 10681 PRODUCTION AVENUE to purchase the Fontana
9  Warehouse for the purpose of stockpiling aluminum.

10  　　　Overt Act No. 13:　On or about January 8, 2010, defendant SHAO
11  sent an email to defendant CHEN and attached a record of previous
12  wire transfers for Global Aluminum.　The attachment listed wire
13  transfers to and from some of the financial shell companies,
14  including, Kong Yum Trading Co. and Kingson Co.

15  　　　Overt Act No. 14:　In or about April 2010, defendant LIU caused
16  defendant CHINA ZHONGWANG to release its 2009 annual report, which
17  stated that sales to the United States accounted for 40.8% of
18  defendant CHINA ZHONGWANG's overall revenue in 2009, up from just
19  1.9% in 2008.

20  　　　Overt Act No. 15:　On or about April 21, 2010, an unindicted
21  co-conspirator ("CC-3") falsely testified before the USITC that PCA
22  was owned and operated independently from the company's suppliers in
23  the PRC.

24  　　　Overt Act No. 16:　In or about late 2010, defendants LIU and
25  CHEN met with CC-2 at the Irvine Warehouse to discuss ways to
26  circumvent the DOC and USITC's likely imposition of AD/CVD orders.

27  　　　Overt Act No. 17:　On or about October 28, 2010, defendant SHAO
28  sent an email to an employee of the ZW Group updating the ZW Group

1  about the DOC's preliminary AD/CVD order imposed against Chinese

2  aluminum.

3      Overt Act No. 18:   On or about October 28, 2010, defendant SHAO

4  called defendant LIU to update him about the DOC's preliminary AD/CVD

5  order, but did not reach defendant LIU.

6      Overt Act No. 19:   On or about December 7, 2010, defendant

7  SHAO, using text provided to him by an employee of the ZW Group, sent

8  an email to an employee of Zhongwang China Investment (HK) Limited

9  requesting a quote for an order of 520 aluminum pallets.

10      Overt Act No. 20:   On or about January 17, 2011, at the

11  direction of an employee of the ZW Group, defendant SHAO sent an

12  email to an employee of Zhongwang China Investment (HK) Limited

13  stating that PCA was satisfied with the quality of the aluminum

14  pallets and intended to place additional orders soon.

15      Overt Act No. 21:   On or about January 29, 2011, a then-

16  Executive Director of defendant CHINA ZHONGWANG sent an email to

17  defendant SHAO asking for documents previously submitted to the USITC

18  by the PERFECTUS predecessor entities.  The requested documents

19  falsely claimed that the PERFECTUS predecessor entities were not

20  related to any Chinese extrusion companies.

21      Overt Act No. 22:   On or about February 9, 2011, defendant SHAO

22  submitted documents to the USITC falsely claiming that PCA was not

23  related to any Chinese extrusion companies.

24      Overt Act No. 23:   In or about March 2011, defendant LIU caused

25  defendant CHINA ZHONGWANG to release its 2010 annual report, which

26  stated that sales to the United States accounted for 29.1% of

27  defendant CHINA ZHONGWANG's overall revenue in 2010, and that the

28  decline in revenue from 2009 was attributable to the USITC and DOC's

1  AD/CVD investigation.

2      Overt Act No. 24:  On or about June 30, 2011, at the direction
3  of defendants LIU and CHEN, an unindicted co-conspirator caused a
4  customs broker to submit to CBP on behalf of Berlinetta Trading the
5  Form 7501 for the importation of a test shipment from Dalian Liwang
6  of approximately 1,422 aluminum pallets valued at approximately
7  $406,617.  The Form 7501 falsely claimed that the aluminum pallets
8  were not subject to the 2011 AD/CVD Orders.

9      Overt Act No. 25:  On or about July 13, 2011, at the direction
10  of defendants LIU and CHEN, an unindicted co-conspirator caused a
11  customs broker to submit to CBP on behalf of Berlinetta Trading the
12  Form 7501 for the importation of a second test shipment from Dalian
13  Liwang of approximately 1,530 aluminum pallets valued at
14  approximately $338,218.  The Form 7501 falsely claimed that the
15  aluminum pallets were not subject to the 2011 AD/CVD Orders.

16      Overt Act No. 26:  On or about July 21, 2011, at the direction
17  of defendants LIU and CHEN, an unindicted co-conspirator caused a
18  customs broker to submit to CBP on behalf of Berlinetta Trading the
19  Form 7501 for the importation of a third test shipment from Dalian
20  Liwang of approximately 756 aluminum pallets valued at approximately
21  $290,769.  The Form 7501 falsely claimed that the aluminum pallets
22  were not subject to the 2011 AD/CVD Orders.

23      Overt Act No. 27:  On or about September 28, 2011, defendant
24  SHAO caused PCA's customs broker to submit to CBP the Form 7501 for
25  the importation from Boruixin of approximately 1,764 aluminum pallets
26  valued at approximately $635,040.  The Form 7501 falsely claimed that
27  the aluminum pallets were not subject to the 2011 AD/CVD Orders.

28      Overt Act No. 28:  On or about November 25, 2011, defendant

46

EXHIBIT 3

1   SHAO caused PCA's customs broker to submit to CBP the Form 7501 for

2   the importation from Dalian Liwang of approximately 3,024 aluminum

3   pallets valued at approximately $1,097,712. The Form 7501 falsely

4   claimed that the aluminum pallets were not subject to the 2011 AD/CVD

5   Orders.

6       Overt Act No. 29:   On or about January 27, 2012, defendant SHAO

7   caused PCA's customs broker to submit to CBP the Form 7501 for the

8   importation from Dalian Liwang of approximately 6,732 aluminum

9   pallets valued at approximately $1,279,080. The Form 7501 falsely

10   claimed that the aluminum pallets were not subject to the 2011 AD/CVD

11   Orders.

12       Overt Act No. 30:   In or about April 2012, defendant LIU caused

13   defendant CHINA ZHONGWANG to release its 2011 annual report, which

14   stated that sales to the United States accounted for 3.9% of

15   defendant CHINA ZHONGWANG's overall revenue in 2011, and that the

16   decline in revenue from 2010 was the result of the continuing AD/CVD

17   investigation in the United States.

18       Overt Act No. 31:   On or about May 10, 2012, defendant SHAO

19   caused PCA's customs broker to submit to CBP the Form 7501 for the

20   importation from Dalian Liwang of approximately 4,590 aluminum

21   pallets valued at approximately $872,100. The Form 7501 falsely

22   claimed that the aluminum pallets were not subject to the 2011 AD/CVD

23   Orders.

24       Overt Act No. 32:   On or about July 9, 2012, defendant SHAO

25   caused PCA's customs broker to submit to CBP the Form 7501 for the

26   importation from Dalian Liwang of approximately 6,552 aluminum

27   pallets valued at approximately $2,358,720. The Form 7501 falsely

28   claimed that the aluminum pallets were not subject to the 2011 AD/CVD

EXHIBIT 3

1 | Orders.

2 | Overt Act No. 33: On or about September 10, 2012, defendant
3 | SHAO sent an email to two employees of the ZW Group falsely stating
4 | that PCA would be placing additional aluminum pallet orders due to
5 | requests by PCA's customers even though, as defendant SHAO then well
6 | knew, PCA had not sold any of the aluminum pallets PCA had previously
7 | imported.

8 | Overt Act No. 34: On or about September 20, 2012, defendant
9 | SHAO caused PCA's customs broker to submit to CBP the Form 7501 for
10 | the importation from Qianxiang of approximately 6,048 aluminum
11 | pallets valued at approximately $1,874,880. The Form 7501 falsely
12 | claimed that the aluminum pallets were not subject to the 2011 AD/CVD
13 | Orders.

14 | Overt Act No. 35: On or about December 1, 2012, at the
15 | direction of defendant LIU, defendant SHAO used Global Aluminum, a
16 | PERFECTUS predecessor entity, to purchase an aluminum mill in Delair,
17 | New Jersey.

18 | Overt Act No. 36: In or about 2013, defendant LIU directed CC-
19 | 2 to build an aluminum melting facility on land previously purchased
20 | by an entity effectively owned and controlled by defendant LIU in
21 | Barstow, California, within the Central District of California, for
22 | the purpose of melting the aluminum pallets imported from the PRC.

23 | Overt Act No. 37: On or about January 11, 2013, defendant SHAO
24 | caused PCA's customs broker to submit to CBP the Form 7501 for the
25 | importation from Dalian Liwang of approximately 9,180 aluminum
26 | pallets valued at approximately $1,496,340. The Form 7501 falsely
27 | claimed that the aluminum pallets were not subject to the 2011 AD/CVD
28 | Orders.

EXHIBIT 3

Overt Act No. 38:   On or about March 14, 2013, defendant SHAO caused PCA's customs broker to submit to CBP the Form 7501 for the importation from Dalian Liwang of approximately 15,120 aluminum pallets valued at approximately $5,367,600.  The Form 7501 falsely claimed that the aluminum pallets were not subject to the 2011 AD/CVD Orders.

Overt Act No. 39:   On March 24, 2013, defendant SHAO sent an email to an employee of the ZW Group requesting the transfer of funds to the PERFECTUS predecessor entities.  Defendant SHAO asked for the request to be approved as directed by the Board of Directors.

Overt Act No. 40:   In or about April 2013, defendant LIU caused defendant CHINA ZHONGWANG to release its 2012 annual report, which stated that sales to the United States accounted for 8.32% of defendant CHINA ZHONGWANG's overall revenue in 2012.  Defendant CHINA ZHONGWANG attributed the increase in sales to the United States in 2012 to defendant CHINA ZHONGWANG's plan to focus on deep-processed industrial aluminum products, namely, aluminum pallets, which could be sold as finished products and were not subject to 2011 AD/CVD Orders.

Overt Act No. 41:   On or about April 8, 2013, defendant SHAO sent an email to an employee of the ZW Group attaching a spreadsheet detailing the funding needs of the PERFECTUS predecessor entities.

Overt Act No. 42:   On or about August 8, 2013, defendant SHAO caused PCA's customs broker to submit to CBP the Form 7501 for the importation from Dalian Liwang of approximately 6,804 aluminum pallets valued at approximately $2,381,400.  The Form 7501 falsely claimed that the aluminum pallets were not subject to the 2011 AD/CVD Orders.

EXHIBIT 3

Overt Act No. 43:   On or about September 23, 2013, defendant SHAO caused PCA's customs broker to submit to CBP the Form 7501 for the importation from Dalian Liwang of approximately 2,520 aluminum pallets valued at approximately $882,000. The Form 7501 falsely claimed that the aluminum pallets were not subject to the 2011 AD/CVD Orders.

Overt Act No. 44:   On or about October 18, 2013, defendant SHAO caused PCA's customs broker to submit to CBP the Form 7501 for the importation from Qianxiang of approximately 3,276 aluminum pallets valued at approximately $1,058,148. The Form 7501 falsely claimed that the aluminum pallets were not subject to the 2011 AD/CVD Orders.

Overt Act No. 45:   In or about April 2014, defendant LIU caused defendant CHINA ZHONGWANG to release its 2013 annual report, which stated that sales to the United States accounted for 11.8% of defendant CHINA ZHONGWANG's overall revenue in 2013. Defendant CHINA ZHONGWANG attributed the increase in sales to the United States in 2013 to defendant CHINA ZHONGWANG's efforts to expand production of deep-processed products, namely, aluminum pallets, to meet increasing demand for these products in the United States.

Overt Act No. 46:   On or about May 5, 2014, defendant SHAO caused PCA's customs broker to submit to CBP the Form 7501 for the importation from Dalian Liwang of approximately 16,128 aluminum pallets valued at approximately $5,644,800. The Form 7501 falsely claimed that the aluminum pallets were not subject to the 2011 AD/CVD Orders.

Overt Act No. 47:   On or about May 5, 2014, defendant SHAO caused PCA's customs broker to submit to CBP the Form 7501 for the importation from Dalian Liwang of approximately 8,568 aluminum

EXHIBIT 3

pallets valued at approximately $2,998,800.  The Form 7501 falsely claimed that the aluminum pallets were not subject to the 2011 AD/CVD Orders.

Overt Act No. 48:  On or about May 9, 2014, defendant SHAO caused PCA's customs broker to submit to CBP the Form 7501 for the importation from Dalian Liwang of approximately 13,356 aluminum pallets valued at approximately $4,674,600.  The Form 7501 falsely claimed that the aluminum pallets were not subject to the 2011 AD/CVD Orders.

Overt Act No. 49:  On or about May 19, 2014, defendant SHAO caused PCA's customs broker to submit to CBP the Form 7501 for the importation from Dalian Liwang of approximately 14,364 aluminum pallets valued at approximately $5,027,400.  The Form 7501 falsely claimed that the aluminum pallets were not subject to the 2011 AD/CVD Orders.

Overt Act No. 50:  On or about May 22, 2014, defendant SHAO caused PCA's customs broker to submit to CBP the Form 7501 for the importation from Dalian Liwang of approximately 4,032 aluminum pallets valued at approximately $1,411,200.  The Form 7501 falsely claimed that the aluminum pallets were not subject to the 2011 AD/CVD Orders.

Overt Act No. 51:  On or about May 23, 2014, defendant SHAO caused PCA's customs broker to submit to CBP the Form 7501 for the importation from Dalian Liwang of approximately 10,584 aluminum pallets valued at approximately $3,704,400.  The Form 7501 falsely claimed that the aluminum pallets were not subject to the 2011 AD/CVD Orders.

Overt Act No. 52:  On or about May 28, 2014, defendant SHAO

EXHIBIT 3

1 | caused PCA's customs broker to submit to CBP the Form 7501 for the
2 | importation from Zhongwang China Investment (HK) Limited of
3 | approximately 1,530 aluminum pallets valued at approximately
4 | $244,800. The Form 7501 falsely claimed that the aluminum pallets
5 | were not subject to the 2011 AD/CVD Orders.

6 |     Overt Act No. 53: On or about May 30, 2014, defendant SHAO
7 | caused PCA's customs broker to submit to CBP the Form 7501 for the
8 | importation from Dalian Liwang of approximately 10,584 aluminum
9 | pallets valued at approximately $3,704,400. The Form 7501 falsely
10 | claimed that the aluminum pallets were not subject to the 2011 AD/CVD
11 | Orders.

12 |     Overt Act No. 54: On or about June 5, 2014, defendants LIU,
13 | CHINA ZHONGWANG, and CHEN caused the transfer of approximately
14 | $999,975 from an account in the name of Rainbow Bright Inc. Limited
15 | held in Hong Kong to PCA Account 9191.

16 |     Overt Act No. 55: On or about June 6, 2014, defendant SHAO
17 | caused PCA's customs broker to submit to CBP the Form 7501 for the
18 | importation from Dalian Liwang of approximately 6,048 aluminum
19 | pallets valued at approximately $2,116,800. The Form 7501 falsely
20 | claimed that the aluminum pallets were not subject to the 2011 AD/CVD
21 | Orders.

22 |     Overt Act No. 56: On or about June 19, 2014, defendant SHAO
23 | directed the transfer of approximately $1,126,080 from PCA Account
24 | 9191 to an account in the name of Zhongwang China Investment (HK)
25 | Limited held in Hong Kong as payment for the purchase of
26 | approximately 7,038 aluminum pallets.

27 |     Overt Act No. 57: On or about June 27, 2014, defendant SHAO
28 | caused PCA's customs broker to submit to CBP the Form 7501 for the

52

EXHIBIT 3

1 importation from Dalian Liwang of approximately 10,080 aluminum
2 pallets valued at approximately $3,528,000. The Form 7501 falsely
3 claimed that the aluminum pallets were not subject to the 2011 AD/CVD
4 Orders.

5     Overt Act No. 58: On or about July 3, 2014, defendants LIU,
6 CHINA ZHONGWANG, and CHEN caused the transfer of approximately
7 $989,975 from an account in the name of Rainbow Bright Inc. Limited
8 held in Hong Kong to PCA Account 9191.

9     Overt Act No. 59: On or about July 11, 2014, defendant SHAO
10 directed the transfer of approximately $4,463,359 from PCA Account
11 9191 to an account in the name of Dalian Liwang held in the PRC as
12 payment for the purchase of approximately 12,096 aluminum pallets.

13     Overt Act No. 60: On or about July 16, 2014, defendants LIU,
14 CHINA ZHONGWANG, and CHEN caused the transfer of approximately
15 $1,539,975 from an account in the name of Grand Famous Trading
16 Limited held in Hong Kong to PCA Account 9191.

17     Overt Act No. 61: On or about July 21, 2014, defendant SHAO
18 directed the transfer of approximately $8,558,512 from PCA Account
19 9191 to an account in the name of Dalian Liwang held in the PRC as
20 payment for the purchase of aluminum products, including
21 approximately 34,002 aluminum pallets.

22     Overt Act No. 62: On or about July 25, 2014, defendants LIU,
23 CHINA ZHONGWANG, and CHEN caused the transfer of approximately
24 $1,699,976 from an account in the name of Grand Famous Trading
25 Limited held in Hong Kong to PCA Account 9191.

26     Overt Act No. 63: On or about August 5, 2014, defendants LIU,
27 CHINA ZHONGWANG, and CHEN caused the transfer of approximately
28 $599,975 from an account in the name of Kun Hong Trade Co., Limited

EXHIBIT 3

1 | held in Hong Kong to PCA Account 9191.

2 |     Overt Act No. 64:   On or about August 5, 2014, defendants LIU,
3 | CHINA ZHONGWANG, and CHEN caused the transfer of approximately
4 | $949,975 from an account in the name of Grand Famous Trading Limited
5 | held in Hong Kong to the PCA Account 9191.

6 |     Overt Act No. 65:   On or about August 5, 2014, defendants LIU,
7 | CHINA ZHONGWANG, and CHEN caused the transfer of approximately
8 | $1,049,975 from an account in the name of Grand Famous Trading
9 | Limited held in Hong Kong to PCA Account 9191.

10 |     Overt Act No. 66:   On or about August 5, 2014, defendants LIU,
11 | CHINA ZHONGWANG, and CHEN caused the transfer of approximately
12 | $3,099,975 from an account in the name of Kun Hong Trade Co., Limited
13 | held in Hong Kong to PCA Account 9191.

14 |     Overt Act No. 67:   On or about August 5, 2014, defendant SHAO
15 | directed the transfer of approximately $244,800 from PCA Account 9191
16 | to an account in the name of Zhongwang China Investment (HK) Limited
17 | held in Hong Kong as payment for the purchase of approximately 1,530
18 | aluminum pallets.

19 |     Overt Act No. 68:   On or about August 6, 2014, defendant SHAO
20 | directed the transfer of approximately $5,027,807 from PCA Account
21 | 9191 to an account in the name of Dalian Liwang held in the PRC as
22 | payment for the purchase of approximately 13,860 aluminum pallets.

23 |     Overt Act No. 69:   On or about August 20, 2014, defendant SHAO
24 | sent an email to an employee of the ZW Group requesting funds for the
25 | rent and operational expenses of Aluminum Industrial and CAA.

26 |     Overt Act No. 70:   In or about October 2014, defendants LIU and
27 | CHEN caused a total of approximately $28,899,700 to be transferred
28 | from Easy Able International (HK) to a bank account in the name of

54

EXHIBIT 3

defendant SCUDERIA DEVELOPMENT.

Overt Act No. 71: On or about October 9, 2014, defendants LIU and CHEN caused approximately $3,099,975 to be transferred from Kun Hong Trade Co. Limited to a bank account in the name of defendant SCUDERIA DEVELOPMENT.

Overt Act No. 72: On or about October 10, 2014, defendants LIU and CHEN caused approximately $1,269,975 to be transferred from Best Earning Trading Limited to a bank account in the name of defendant SCUDERIA DEVELOPMENT.

Overt Act No. 73: On or about October 10, 2014, defendants LIU and CHEN caused approximately $1,389,975 to be transferred from Group Like Limited to a bank account in the name of defendant SCUDERIA DEVELOPMENT.

Overt Act No. 74: On or about October 10, 2014, defendants LIU and CHEN caused approximately $3,199,958 to be transferred from Golden Shield Investment Limited to a bank account in the name of defendant SCUDERIA DEVELOPMENT.

Overt Act No. 75: On or about October 14, 2014, defendants LIU and CHEN caused approximately $639,979 to be transferred from Group Like Limited to a bank account in the name of defendant SCUDERIA DEVELOPMENT.

Overt Act No. 76: On or about October 14, 2014, defendants LIU and CHEN caused approximately $6,499,975 to be transferred from Kun Hong Trade Co., Limited to a bank account in the name of defendant SCUDERIA DEVELOPMENT.

Overt Act No. 77: On or about October 17, 2014, defendants LIU and CHEN caused the transfer of approximately $1,299,975 from an account in the name of Easy Able International (HK) held in Hong Kong

EXHIBIT 3

1  to PCA Account 9191.

2      Overt Act No. 78:   On or about October 28, 2014, defendant LIU
3  caused defendant SCUDERIA DEVELOPMENT to purchase the Riverside
4  Warehouse for the purpose of stockpiling aluminum.

5      Overt Act No. 79:   On or about October 29, 2014, defendant LIU
6  caused defendant SCUDERIA DEVELOPMENT to transfer by means of wire
7  approximately $42,864,450 to a title company in connection with the
8  purchase of the Riverside Warehouse.

9      Overt Act No. 80:   On or about November 25, 2014, CC-1 caused
10  to be filed with the California Secretary of State a PCA Statement of
11  Information indicating that CC-1 had replaced defendant SHAO as the
12  CEO, Secretary, and CFO of PCA.  Defendant LIU continued to
13  effectively own and control PCA.

14      Overt Act No. 81:   On or about December 8, 2014, at the
15  direction of defendant SHAO, an employee of PCA submitted a funding
16  request to an employee of the ZW Group for the rent and expenses for
17  AAA, Aluminum Industrial, Aluminum Source, and CAA for the period of
18  October 2014 through January 2015.

19      Overt Act No. 82:   On or about December 31, 2014, at the
20  direction of defendant LIU, CC-1 caused the PERFECTUS predecessor
21  entities to be merged into defendants PERFECTUS and PERFECTUS
22  ACQUISITIONS.  Defendant LIU effectively owned and controlled
23  defendants PERFECTUS and PERFECTUS ACQUISITIONS.

24      Overt Act No. 83:   In or about early 2015, defendant SHAO
25  caused Aluminum Shapes to provide to CBP a presentation purportedly
26  from PCA falsely claiming, among other things, that PCA manufactured
27  the aluminum pallets, the pallets were suitable for use in chemical
28  and metal industries, and the pallets had fully-sealed welds.

56                    EXHIBIT 3

1  Overt Act No. 84:   In or about January 2015, at the direction
2  of defendant LIU, CC-1 purported to transfer ownership of defendant
3  PERFECTUS to a third-party when, in fact, defendant LIU retained
4  control of defendant PERFECTUS.

5  Overt Act No. 85:   On or about March 6, 2015, defendant
6  PERFECTUS transferred approximately $493,308 from Transport Account
7  2058 to an account in the name of Liaoning Zhongwang Import & Export
8  Trade Co., Ltd. held in the PRC, as payment for the purchase of
9  aluminum products.

10  Overt Act No. 86:   In or around April 2015, defendant LIU
11  caused defendant CHINA ZHONGWANG to release its 2014 annual report,
12  which stated that sales to the United States accounted for 11.67% of
13  defendant CHINA ZHONGWANG's overall revenue in 2014.   Defendant CHINA
14  ZHONGWANG stated that this revenue was the result of defendant CHINA
15  ZHONGWANG's expansion of its production of deep-processed products,
16  namely, aluminum pallets, to meet increasing demand for these
17  products in the United States.

18  Overt Act No. 87:   On or about April 6, 2015, defendant
19  PERFECTUS transferred approximately $1,947,140 from Transport Account
20  2058 to an account in the name of Dalian Liwang held in the PRC as
21  payment for the purchase of aluminum products.

22  Overt Act No. 88:   On or about June 4, 2015, defendant SHAO
23  falsely told the IRS that Global Aluminum's creditors were not
24  related to any of its suppliers or manufacturers and that defendant
25  SHAO was not related to the ZW Group or Dalian Liwang.

26  Overt Act No. 89:   On or about July 31, 2015, defendant LIU
27  caused defendant CHINA ZHONGWANG to suspend trading of defendant
28  CHINA ZHONGWANG's shares pending the release of defendants CHINA

57                    EXHIBIT 3

1 | ZHONGWANG and LIU's response to allegations of fraud made against
2 | defendants CHINA ZHONGWANG and LIU by a short seller of defendant
3 | CHINA ZHONGWANG's shares.

4 |     Overt Act No. 90: On or about August 12, 2015, defendant LIU
5 | caused defendant CHINA ZHONGWANG to resume trading of defendant CHINA
6 | ZHONGWANG's shares and issued a specific disclosure responding to the
7 | short seller's allegations. In the specific disclosure, defendants
8 | CHINA ZHONGWANG and LIU stated that the allegations made against
9 | defendants LIU and CHINA ZHONGWANG were groundless and contained
10 | misrepresentations and false allegations that defendant CHINA
11 | ZHONGWANG stated were designed to affect the price of defendant CHINA
12 | ZHONGWANG's shares. In this announcement, defendant LIU caused
13 | defendant CHINA ZHONGWANG to make material false statements,
14 | including the following: (1) except for .04% of its total revenues,
15 | all revenue was generated from sales to independent third parties;
16 | (2) any stake in PCA and Aluminicaste briefly held by defendant LIU's
17 | family had been disposed of to an independent third party; and
18 | (3) Dalian Liwang, Qianxiang, and Boruixin were independent third
19 | parties.

20 |     Overt Act No. 91: On or about September 10, 2015, defendant
21 | LIU caused defendant CHINA ZHONGWANG to issue a specific disclosure.
22 | In this specific disclosure, defendants LIU and CHINA ZHONGWANG made
23 | material false statements, including that defendant PERFECTUS, PCA,
24 | Aluminicaste, and GVA were third parties independent of defendants
25 | LIU and CHINA ZHONGWANG.

26 |     Overt Act No. 92: In or about 2016, defendants LIU, SHAO, and
27 | PERFECTUS exported approximately 6,337 containers of aluminum pallets
28 | that were being held at the Irvine, Fontana, Ontario, and Riverside

EXHIBIT 3

1 | Warehouses to GVA.

2 |     Overt Act No. 93:   In or about April 2016, defendant LIU caused
3 | defendant CHINA ZHONGWANG to release its 2015 annual report, which
4 | stated that sales to the United States accounted for 11.1% of
5 | defendant CHINA ZHONGWANG's overall revenue in 2015.

6 |     Overt Act No. 94:   On or about December 27, 2016, defendant
7 | SHAO submitted and caused to be submitted to the U.S. District Court
8 | for the Central District of California a declaration falsely stating
9 | that the PERFECTUS predecessor entities originally intended to sell
10 | or lease the aluminum pallets in the United States, but none were
11 | sold due to changes in market conditions and an unsuccessful
12 | marketing strategy.

13 |     Overt Act No. 95:   On or about May 12, 2017, defendant LIU
14 | caused defendant CHINA ZHONGWANG to issue a specific disclosure.  In
15 | this disclosure, defendants LIU and CHINA ZHONGWANG falsely stated
16 | that defendant CHINA ZHONGWANG's sales to third parties were
17 | completed on an arms-length basis and that it had no arrangements
18 | with these third parties to finance the purchase of its own products.

19 |     Overt Act No. 96:   On or about September 17, 2017, defendant
20 | LIU caused defendant CHINA ZHONGWANG to issue a specific disclosure
21 | stating that, after having spoken with defendant LIU, defendant CHINA
22 | ZHONGWANG had re-affirmed that defendant LIU did not control and was
23 | not the beneficial owner of defendant PERFECTUS.

24 |     Overt Act No. 97:   On or about October 2, 2017, an unindicted
25 | co-conspirator and close family member of defendant LIU ("CC-4")
26 | signed declarations filed with the U.S. District Court for the
27 | Central District Court of California falsely claiming to be the
28 | ultimate beneficial owner of the Irvine, Ontario, Fontana, and

EXHIBIT 3

1  Riverside Warehouses.

2      Overt Act No. 98:   On or about December 12, 2017, defendant
3  CHEN falsely testified in a deposition that defendant CHEN was the
4  ultimate beneficial owner of the Ontario, Irvine, and Fontana
5  Warehouses and that CC-2 was acting on defendant CHEN's behalf.

EXHIBIT 3

COUNTS TWO THROUGH TEN

[18 U.S.C. §§ 1343, 2(a)]

35.  The Grand Jury hereby realleges and incorporates by reference paragraphs 1 through 31, 33, and 34 of this Indictment as though fully set forth herein.

A.  SCHEME TO DEFRAUD

36.  Beginning in or about July 2008 and continuing to at least the date of this Indictment, within the Central District of California, and elsewhere, defendants ZHONGTIAN LIU, also known as ("aka") "Liu Zhongtian," aka "Chairman," aka "Uncle Liu," aka "UL," aka "Big Boss" ("defendant LIU"), CHINA ZHONGWANG HOLDINGS LIMITED, aka "ZW," aka "Mother Ship" ("defendant CHINA ZHONGWANG"), ZHAOHUA CHEN, aka "Chen Zhaohua," aka "Uncle Chen" ("defendant CHEN"), XIANG CHUN SHAO, aka "Johnson Shao" ("defendant SHAO"), defendant PERFECTUS ALUMINIUM INC., aka "Perfectus Aluminum Inc." ("defendant PERFECTUS"), PERFECTUS ALUMINUM ACQUISITIONS, LLC ("defendant PERFECTUS ACQUISITIONS"), SCUDERIA DEVELOPMENT, LLC ("defendant SCUDERIA DEVELOPMENT"), 1001 DOUBLEDAY, LLC ("defendant 1001 DOUBLEDAY"), VON KARMAN – MAIN STREET, LLC ("defendant VON KARMAN – MAIN STREET"), and 10681 PRODUCTION AVENUE, LLC ("defendant 10681 PRODUCTION AVENUE"), and others known and unknown to the Grand Jury, aiding and abetting each another, knowingly and with intent to defraud, devised, participated in, executed, and attempted to execute a scheme to defraud investors in defendant CHINA ZHONGWANG as to material matters, and to obtain money from such investors by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts.

37.  The scheme operated, in substance, as set forth in

61                          EXHIBIT 3

1  paragraphs 33 and 34 of this Indictment.

2  B.   USE OF WIRES

3       38.  On or about the following dates, in Los Angeles, Orange,

4  Riverside, and San Bernardino Counties, within the Central District

5  of California, and elsewhere, defendants LIU, CHINA ZHONGWANG, CHEN,

6  SHAO, PERFECTUS, PERFECTUS ACQUISITIONS, SCUDERIA DEVELOPMENT, 1001

7  DOUBLEDAY, VON KARMAN – MAIN STREET, and 10681 PRODUCTION AVENUE, and

8  others known and unknown to the Grand Jury, aiding and abetting each

9  other, for the purpose of executing the above-described scheme to

10 defraud, transmitted and caused the transmission of the following

11 items by means of wire communication in interstate and foreign

12 commerce:

| COUNT | DATE | INTERSTATE AND FOREIGN WIRING |
|-------|------|-------------------------------|
| TWO | 05/13/2014 | Email from an employee of the ZW Group, sent by means of interstate and foreign wires, to defendant SHAO in the Central District of California, asking for payment for aluminum. |
| THREE | 06/19/2014 | Transfer of approximately $1,126,080 from PCA Account 9191, by means of interstate and foreign wires, to an account in the name of Zhongwang China Investment (HK) Limited held in Hong Kong. |
| FOUR | 07/11/2014 | Transfer of approximately $4,463,369 from PCA Account 9191, by means of interstate and foreign wires, to an account in the name of Dalian Liwang held in the PRC. |
| FIVE | 07/21/2014 | Transfer of approximately $8,558,512 from PCA Account 9191, by means of interstate and foreign wires, to an account in the name of Dalian Liwang held in the PRC. |

EXHIBIT 3

| COUNT | DATE | INTERSTATE AND FOREIGN WIRING |
|-------|------|-------------------------------|
| SIX | 08/05/2014 | Transfer of approximately $244,800 from PCA Account 9191, by means of interstate and foreign wires, to an account held in the name of Zhongwang China Investment (HK) Limited held in Hong Kong. |
| SEVEN | 08/06/2014 | Transfer of approximately $5,027,807 from PCA Account 9191, by means of interstate and foreign wires, to an account in the name of Dalian Liwang held in the PRC. |
| EIGHT | 08/20/2014 | Email from defendant SHAO sent, from the Central District of California, by means of interstate and foreign wires, to an employee of ZW Group in the PRC requesting funds for rent and operational expenses of Aluminum Industrial and CAA. |
| NINE | 03/06/2015 | Transfer of approximately $493,308 from Transport Account 2058, by means of interstate and foreign wires, to an account in the name of Liaoning Zhongwang Import & Export Trade Co., Ltd. held in the PRC. |
| TEN | 04/06/2015 | Transfer of approximately $1,947,140 from Transport Account 2058, by means of interstate and foreign wires, to an account Dalian Liwang held in the PRC. |

63                                    EXHIBIT 3

1

2

COUNTS ELEVEN THROUGH SEVENTEEN

[18 U.S.C. §§ 545, 2]

3   39.   The Grand Jury hereby realleges and incorporates by

4   reference paragraphs 1 through 31, 33, and 34 of this Indictment as

5   though fully set forth herein.

6   40.   On or about the dates set forth below, in Los Angeles,

7   Orange, Riverside, and San Bernardino Counties, within the Central

8   District of California, and elsewhere, defendants ZHONGTIAN LIU, also

9   known as ("aka") "Liu Zhongtian," aka "Chairman," aka "Uncle Liu,"

10  aka "UL," aka "Big Boss," CHINA ZHONGWANG HOLDINGS LIMITED, aka "ZW,"

11  aka "Mother Ship," ZHAOHUA CHEN, aka "Chen Zhaohua," aka "Uncle

12  Chen," XIANG CHUN SHAO, aka "Johnson Shao," defendant PERFECTUS

13  ALUMINIUM INC., aka "Perfectus Aluminum Inc.," PERFECTUS ALUMINUM

14  ACQUISITIONS, LLC, SCUDERIA DEVELOPMENT, LLC, 1001 DOUBLEDAY, LLC,

15  VON KARMAN - MAIN STREET, LLC, and 10681 PRODUCTION AVENUE, LLC, and

16  others known and unknown to the Grand Jury, aiding and abetting each

17  other, knowingly, willfully, and with intent to defraud the United

18  States, made out and passed, and caused to be made out and passed,

19  through a customhouse of the United States, the false and fraudulent

20  documents set forth below, in order to influence the actions of the

21  United States regarding the importation into the United States of

22  aluminum pallets:

23  //

24  //

25

26

27

28

64                                    EXHIBIT 3

| COUNT | DATE | FALSE AND FRAUDULENT DOCUMENT |
|-------|------|-------------------------------|
| ELEVEN | 05/19/2014 | Form 7501, bearing entry number W3303379083, falsely declaring that the 14,364 aluminum pallets from the PRC were not subject to the 2011 AD/CVD Orders. |
| TWELVE | 05/22/2014 | Form 7501, bearing entry number W3303379737, falsely declaring that the 4,032 aluminum pallets from the PRC were not subject to the 2011 AD/CVD Orders. |
| THIRTEEN | 05/23/2014 | Form 7501, bearing entry number HR702108724, falsely declaring that the 10,584 aluminum pallets from the PRC were not subject to the 2011 AD/CVD Orders. |
| FOURTEEN | 05/28/2014 | Form 7501, bearing entry number HR702108708, falsely declaring that the 1,530 aluminum pallets from the PRC were not subject to the 2011 AD/CVD Orders. |
| FIFTEEN | 05/30/2014 | Form 7501, bearing entry number W3303381550, falsely declaring that the 10,584 aluminum pallets from the PRC were not subject to the 2011 AD/CVD Orders. |
| SIXTEEN | 06/06/2014 | Form 7501, bearing entry number HR702109383, falsely declaring that the 6,048 aluminum pallets from the PRC were not subject to the 2011 AD/CVD Orders. |
| SEVENTEEN | 06/27/2014 | Form 7501, bearing entry number W3303385676, falsely declaring that the 10,080 aluminum pallets from the PRC were not subject to the 2011 AD/CVD Orders. |

EXHIBIT 3

COUNTS EIGHTEEN THROUGH TWENTY-FOUR

[18 U.S.C. §§ 1956(a)(2)(A), 2]

41. The Grand Jury hereby realleges and incorporates by reference paragraphs 1 through 31, 33, and 34 of this Indictment as if fully set forth herein.

42. On or about the dates set forth below, in Los Angeles, Orange, Riverside, and San Bernardino Counties, within the Central District of California, and elsewhere, defendants ZHONGTIAN LIU, also known as ("aka") "Liu Zhongtian," aka "Chairman," aka "Uncle Liu," aka "UL," aka "Big Boss," CHINA ZHONGWANG HOLDINGS LIMITED, aka "ZW," aka "Mother Ship," ZHAOHUA CHEN, aka "Chen Zhaohua," aka "Uncle Chen," XIANG CHUN SHAO, aka "Johnson Shao," defendant PERFECTUS ALUMINIUM INC., aka "Perfectus Aluminum Inc.," and PERFECTUS ALUMINUM ACQUISITIONS, LLC, and others known and unknown to the Grand Jury, aiding and abetting each other, transported, transmitted, and transferred, and attempted to transport, transmit, and transfer, and willfully caused others to transport, transmit, and transfer, and attempt to transport, transmit, and transfer funds to a place in the United States from and through a place outside of the United States, with the intent to promote the carrying on of specified unlawful activity, namely, wire fraud, in violation of Title 18, United States Code, Section 1343, and passing false and fraudulent papers through a customhouse, in violation of Title 18, United States Code, Section 545, through the following transactions:

//

//

EXHIBIT 3

| COUNT | DATE | TRANSACTION |
|-------|------|-------------|
| EIGHTEEN | 06/05/2014 | Wire transfer of approximately $999,975 to PCA Account 9191 from an account in the name of Rainbow Bright Inc. Limited held in Hong Kong. |
| NINETEEN | 07/03/2014 | Wire transfer of approximately $989,975 to PCA Account 9191 from an account in the name of Rainbow Bright Inc. Limited held in Hong Kong. |
| TWENTY | 07/16/2014 | Wire transfer of approximately $1,539,975 to PCA Account 9191 from an account in the name of Grand Famous Trading Limited held in Hong Kong. |
| TWENTY-ONE | 07/25/2014 | Wire transfer of approximately $1,699,975 to PCA Account 9191 from an account in the name of Grand Famous Trading Limited held in Hong Kong. |
| TWENTY-TWO | 08/05/2014 | Wire transfer of approximately $599,975 to PCA Account 9191 from an account held in the name of Kun Hong Trade Co., Limited held in Hong Kong. |
| TWENTY-THREE | 08/05/2014 | Wire transfer of approximately $3,099,975 to PCA Account 9191 from an account in the name of Kun Hong Trade Co., Limited held in Hong Kong. |
| TWENTY-FOUR | 10/17/2014 | Wire transfer of approximately $1,299,975 to PCA Account 9191 from an account in the name of Easy Able International (HK) held in Hong Kong. |

EXHIBIT 3

FORFEITURE ALLEGATION ONE

[18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)]

1.    Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), in the event of any defendant's conviction of the offenses set forth in any of Counts One through Ten of this Indictment.

2.    Any defendant so convicted shall forfeit to the United States of America the following:

    a.    all right, title, and interest in any and all property, real or personal, constituting, or derived from, any proceeds traceable to the offenses; and

    b.    To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3.    Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), any defendant so convicted shall forfeit substitute property, up to the value of the property described in the preceding paragraph if, as the result of any act or omission of said defendant, the property described in the preceding paragraph or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

EXHIBIT 3

FORFEITURE ALLEGATION TWO

[18 U.S.C. §§ 982 and 545]

1.  Pursuant to Rule 32.2(a) of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Sections 982 and 545, and Title 28, United States Code, Section 2461(c), in the event of any defendant's conviction of the offenses set forth in any of Counts Eleven through Seventeen of this Indictment.

2.  Any defendant so convicted shall forfeit to the United States the following:

(a) All right, title, and interest in any and all property, real or personal constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of each such offense;

(b)  Any and all merchandise introduced into the United States in violation of Title 18, United States Code, Section 545, or the value thereof; and

(c)  To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraphs (a) and (b).

3.  Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b) and Title 28, United States Code, Section 2461(c), any defendant so convicted shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as the result of any act or omission of said defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred,

69                          EXHIBIT 3

1   sold to or deposited with a third party; (c) has been placed beyond

2   the jurisdiction of the Court; (d) has been substantially diminished

3   in value; or (e) has been commingled with other property that cannot

4   be divided without difficulty.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 3

1

FORFEITURE ALLEGATION THREE

2

[18 U.S.C. § 982 and 28 U.S.C. § 2461(c)]

3     1.   Pursuant to Rule 32.2(a) of the Federal Rules of Criminal
4 Procedure, notice is hereby given that the United States will seek
5 forfeiture as part of any sentence, pursuant to Title 18, United
6 States Code, Section 982(a)(1) and Title 28, United States Code,
7 Section 2461(c), in the event of any defendant's conviction of the
8 offenses set forth in any of Counts Eighteen through Twenty-Four of
9 this Indictment.

10     2.   Any defendant so convicted shall forfeit to the United
11 States of America the following:

12     (a)   Any property, real or personal, involved in such
13 offense, and any property traceable to such property; and

14     (b)   To the extent such property is not available for
15 forfeiture, a sum of money equal to the total value of the property
16 described in subparagraph (a).

17     3.   Pursuant to Title 21, United States Code, Section 853(p),
18 as incorporated by Title 18, United States Code, Section 982(b)(1),
19 and Title 18, United States Code, Section 982(b)(2), any defendant so
20 convicted shall forfeit substitute property, if, by any act or
21 omission of said defendant, the property described in the preceding
22 paragraph, or any portion thereof: (a) cannot be located upon the
23 exercise of due diligence; (b) has been transferred, sold to, or
24 deposited with a third party; (c) has been placed beyond the
25 jurisdiction of the court; (d) has been substantially diminished in
26 value; or (e) has been commingled with other property that cannot be
27 divided without difficulty. Substitution of assets shall not be
28 ordered, however, where the convicted defendant acted merely as an

71

EXHIBIT 3

1  intermediary who handled but did not retain the property in the
2  course of the money laundering offense unless the defendant, in
3  committing the offense or offenses giving rise to the forfeiture,
4  conducted three or more separate transactions involving a total of
5  $100,000.00 or more in any twelve-month period.

6

7                                    A TRUE BILL

8

9                                    /s/
                                     _____
10                                   Foreperson

11  NICOLA T. HANNA
    United States Attorney
12

13

14  LAWRENCE S. MIDDLETON
    Assistant United States Attorney
15  Chief, Criminal Division

16  RANEE A. KATZENSTEIN
    Assistant United States Attorney
17  Chief, Major Frauds Section

18  POONAM G. KUMAR
    Assistant United States Attorney
19  Deputy Chief, Major Frauds Section

20  EDDIE A. JAUREGUI
    Assistant United States Attorney
21  Major Frauds Section

22  JULIAN L. ANDRÉ
    Assistant United States Attorney
23  Major Frauds Section

24

25

26

27

28

                                72                    EXHIBIT 3

## Tax Collector » Taxes Due for Parcel 0255-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

There is 1 current bill and 1 **defaulted bill** due for this parcel.                              3/4/2020 4:13:37 PM

The total amount due for this parcel is **$3,041,916.83**

View and select the bill(s) below that you would like to pay, check the appropriate EPAY box(es) on the right, and then click **Add to Cart**. Shopping carts expire at midnight. Payment transactions not completed before midnight will need to be restarted and may be subject to applicable penalties and/or interest.

### Secured Bills

| Bill Number | Tax Amt | Penalty | Cost | Total Due | Status | Installment Delinquent Date | E-Pay |
|---|---|---|---|---|---|---|---|
| 190172898 Installment 1 | 500,374.15 | 50,037.43 | 0.00 | 550,411.58 | Secured | 12/10/2019 | ☐ *e-Pay* |
| 190172898 Installment 2 | 500,374.13 | 0.00 | 0.00 | 500,374.13 | Secured | 4/10/2020 | ☐ *e-Pay* |
| Total: | 1,000,748.28 | 50,037.43 | 0.00 | 1,050,785.71 | | | |

## Defaulted Bills for Parcel 0255-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

**To Pay Defaulted Secured Bills Online:**
Click on the EPay Box below then select the payment type below.

Defaulted **Secured Bills**

| Bill Number | Amount | Penalty | Cost | Interest | Fees | Total |
|---|---|---|---|---|---|---|
| 170955854 | 738,969.72 | 73,896.98 | 10.00 | 232,775.46 | 0.00 | 1,045,652.16 |
| 180955240 | 765,549.76 | 76,554.99 | 10.00 | 103,349.21 | 0.00 | 945,463.96 |
| Sub Total: | 1,504,519.48 | 150,451.97 | 20.00 | 336,124.67 | 0.00 | 1,991,116.12 |

| Default Date | Redemption Fee | Cost of Notice | Recision Fee | Other Costs | Redemption Total | E-Pay |
|---|---|---|---|---|---|---|
| 6/30/2018 | 15.00 | 0.00 | 0.00 | 0.00 | **1,991,131.12** | ☐ *e-Pay* |

**Future Redemption Amount Due if Unpaid**
*Amounts shown do not include additional penalties if current year bills are not paid prior to their default date.*

| Apr 2020 | May 2020 | Jun 2020 |
|---|---|---|
| 2,013,698.91 | 2,036,266.71 | 2,058,834.49 |

**The redemption total for Defaulted Bills is valid through 3/31/2020**
*On the first of each month, additional interest will apply.*

[ Return to Search ]    [ Add to Cart ]

You may pay your tax bill(s) online from your United States bank checking or savings account at no charge, or with your VISA, MasterCard, Discover or American Express card, a Convenience Fee applies. *The Convenience Fee is not retained by the County of San Bernardino.* You may also make payments over the phone by calling (909) 387-8308.

**Click here** for a printer friendly version of this page.

You can use the menu to the left to see additional information about this parcel.

---

### Navigation Menu

- Home
- Treasurer
- Tax Collector
- Property Tax Information
  - ↳ Find Property
  - ↳ Property Information
  - ↳ Parcel Map
  - ↳ Owner History
  - ↳ Parcel History
  - ↳ Paid Bill History
  - ↳ Taxes Due
  - ↳ Pay Taxes Online
  - ↳ View Tax Payment Cart
  - ↳ Print a Duplicate Tax Bill
  - ↳ Estimate Your Tax Bills
  - ↳ Mello-Roos and Bonds
- Understanding Your Tax Bill
- Understanding Postmarks
- New Homeowner Information
- Where Do My Property Tax Dollars Go?
- Important Dates
- Penalty Cancellation Request Form
- Mobile Home Tax Clearance
- Publications
- Tax Collector Fee Schedule
- Tax Relief Information
- Tax Sale Information
- Unclaimed Property Tax Refund
- Transient Occupancy Tax
- Wire and ACH Payments
- Bulk Tax Payments
- Frequently Asked Questions
- Meet Your Treasurer - Tax Collector
- Where Do My Property Tax Dollars Go?
- About Us
- Contact Us
- E-Mail & SMS Subscription Service
- SBCounty.gov

Click here to follow us on social media




TAX BILLS DELIVERED TO YOUR INBOX
ELECTRONIC TAX BILL DELIVERY
SAN BERNARDINO
GREEN COUNTY


DigiCert EV SSL
SECURE
EV SSL

SIMPLY A BETTER WAY TO DO BUSINESS ®

2020 San Bernardino County Auditor-Controller/Treasurer/Tax Collector - All Rights Reserved | Privacy Policy | Terms of Use | Site Map | Site Requirements